IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **ESTATE OF STEPHEN C. POPOVICH** | ) | CASE NO. _____ |
| 1407 Shagbark Trial | ) | |
| Murfreesboro, Tennessee 37130 | ) | JUDGE _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| *-v-* | ) | |
| | ) | |
| **REX ELLIOTT** | ) | **COMPLAINT FOR MONEY DAMAGES** |
| 2175 Riverside Drive, | ) | **(Jury Demand Endorsed Hereon)** |
| Columbus, Ohio 43221 | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| *-and-* | ) | |
| | ) | |
| **CHARLES COOPER, JR.** | ) | |
| 2175 Riverside Drive, | ) | |
| Columbus, Ohio 43221 | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| *-and-* | ) | |
| | ) | |
| **COOPER & ELLIOTT, LLC** | ) | |
| 2175 Riverside Drive, | ) | |
| Columbus, Ohio 43221 | ) | |
| | ) | |
| Defendant. | ) | |

Now comes the Plaintiff, the Estate of Stephen C. Popovich, by and through the undersigned legal counsel, and for its Complaint hereby states and avers as follows:

### INTRODUCTION

1.      This action is brought to determine the reasonableness of a certain contingent attorney fee charged by the Defendants in connection with a prior lawsuit litigated in this U.S. District Court (before the Honorable Judge Donald C. Nugent) which is styled as *The Estate of Stephen C. Popovich v. Sony Music and Entertainment Company, et al., Case No. 1:11CV02052-DCN* (referenced as the "Third Sony Royalty Case").

2.      This action entails an interpretation of the scope and validity of a certain written contingency fee agreement between the Popovich Estate and the Defendants, and a determination of the reasonableness of the contingent attorney fee which has been retained by the Defendants in violation of multiple orders of the Probate Court for Rutherford County, Tennessee.

### JURISDICTION & VENUE

3.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2) because complete diversity exists between the Plaintiff and Defendant(s), and the amount in controversy exceeds $75,000.00.

4.      Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(b)(2) as the United States District Court for the Northern District of Ohio, Eastern Division is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## THE PARTIES

5.      Mr. Stephen C. Popovich died unexpectedly in Murfreesboro, Tennessee on June 8, 2011.  The Plaintiff in this action is the Estate of Mr. Stephen C. Popovich, which is filed and remains pending in Rutherford County, Tennessee.

6.      Co-defendants, Attorney Rex Elliot and Attorney Charles Cooper, Jr., are licensed Ohio attorneys, believed to be the founding and controlling members of co-defendant Cooper & Elliott, LLC., and have practiced in this Court by serving as legal counsel for the Popovich Estate in the Third Sony Royalty Case.

7.      Co-defendant Cooper & Elliot, LLC is an Ohio law firm conducting business as an Ohio limited liability company and having its principal offices at 2175 Riverside Drive, Columbus, Ohio 43221.

## BACKGROUND FACTS

8.      By this reference the Plaintiff incorporates herein all prior allegations set forth in the Complaint as though fully rewritten.

9.      With the assistance of Mr. Frank Yankovich, in 1962, Mr. Stephen C. Popovich began his career in the music industry stocking warehouse shelves in Cleveland, Ohio for CBS/Columbia Records.  From this humble position, Mr. Popovich worked his way up the ranks at CBS Records and moved to New York in 1969.  Mr. Popovich later became the first Vice-President of Promotion at CBS/Columbia and later the youngest Vice President at CBS, Inc., the parent company of CBS Records.  After signing Michael Jackson to Epic Records, Mr. Popovich became the first ever recipient of the company's prestigious Clive Davis award for promotion.

10.    While at CBS/Columbia, Mr. Popovich worked with several acts including Bob Dylan, Simon and Garfunkel, Santana, Earth, Wind & Fire, Johnny Cash, Chicago, Billy Joel, Bruce Springsteen, and countless others.  Mr. Popovich was later offered and accepted the position of Vice President of A & R (Artist & Repertoire) at CBS/Epic Records where he was instrumental in signing and developing the careers of artists such as Boston, Ted Nugent, Michael Jackson, the Jacksons, The Charlie Daniels Band, REO Speedwagon, and others.  As a result of his successful career in the music industry, Mr. Popovich was named by the Cleveland Plain Dealer as one of Cleveland's 25 most influential natives along with the likes of Phil Donahue, Paul Newman, Bob Hope, and Henry Mancini.  Mr. Popovich was further instrumental in securing the Rock & Roll Hall of Fame being located in Cleveland, Ohio.

11.    In late 1976, Mr. Popovich left CBS records to form his own business venture. Mr. Popovich's desire was to build a record label comparable to Philadelphia Records, Sun Records, or Motown.  Because of his roots in Cleveland, Ohio, Mr. Popovich made Cleveland the headquarters for his new business and chose to display "Cleveland" prominently in the name of his new business.  As such, the name "Cleveland Entertainment Company" (CEC) was chosen for the overall corporate entity, which was a New York corporation.  Under the umbrella of CEC were several unincorporated divisions with separate functions.  For example, "Burning River Music" was the name given to the division responsible for administering CEC publishing rights, and "Cleveland International Records" was the name Mr. Popovich chose and gave to the production division (the record label) within CEC and was the division credited with the production of artist recordings.

12.     As a result of Mr. Popovich's legendary status in the music industry, prior to leaving CBS Records, CBS had already promised him a three year production agreement for his new business.  On or about January 1, 1977, CEC entered into a written production agreement with CBS Records.  Pursuant to the terms of this 1977 Production Agreement, CEC would deliver to CBS Records master recordings of artists signed by CEC and accepted by CBS Records.  CBS Records would manufacture, distribute, and sell the records and tapes of these artists under the Epic Record Label and CEC would receive compensation in the form of royalties.  CEC subsequently entered into certain renewed and amended Distribution Agreements with CBS in 1979 and 1982.

13.     Immediately after the formation of CEC, Mr. Popovich began signing artists to CEC and its "record label" Cleveland International Records.  One of the first artists signed to the Cleveland International Records label was Mr. Michael Aday, professionally known as "Meatloaf."  More specifically, on or about August 15, 1977, CEC entered into an agreement with Meatloaf Enterprises, Inc. (hereinafter referenced as "Meatloaf") pursuant to which Meatloaf agreed to furnish to CEC the exclusive recording services of Meatloaf.  The Meatloaf recordings would then be distributed through CBS Records pursuant to the terms of the 1977 Production/Distribution Agreement between CEC and CBS Records.

14.     Pursuant to the terms of the written agreement between Meatloaf and CEC, the following albums, among others, were produced, commercially released and distributed by CEC through CBS Records and its corporate successor Sony Music: "*Bat Out of Hell", "Dead Ringer", "Midnight at the Lost & Found",* and "*Hits Out of Hell". "Bat Out of Hell"* is one of the greatest selling albums of all time and is presently number 10 on the list of best selling albums worldwide with over 34 million copies sold.

5

15.     Following the release of the Meatloaf albums on the compact disc medium, Meatloaf again began enjoying widespread commercial success.  In the early to mid-1990's a dispute arose between Sony Music (the successor-in-interest to CBS Records) and CEC (and its shareholders Stephen Popovich, Samuel Lederman, and Stanford Snyder) regarding <u>unpaid </u>royalties due and owing to CEC for Meatloaf recordings distributed pursuant to the 1977, 1979 and 1982 Distribution Agreements.

16.     Mr. Walter Yetnikoff was President of CBS Records and a Vice-President of CBS from 1975 until sometime in or about September 1990.  Mr. Yetnikoff is credited with creating one of the most prestigious and profitable stable of recording artists in music history, which included Meatloaf, Bruce Springsteen and the E-Street Bank, Billy Joel, and Michael Jackson.  Mr. Popovich was instrumental in the signing of these artists and the development of their careers.

17.     Each of the Distribution Agreements between CEC and CBS/Sony contained certain statutes of limitations and contractual time limitations for conducting an audit of Sony's books and records and for commencing a civil lawsuit to recover <u>unpaid</u> royalties. In an unprecedented act, based on Mr. Popovich's achievements under Mr. Yetnikoff, prior to retiring Mr. Yetnikoff executed a certain waiver of the applicable statutes of limitations and contractual time limitations, thus, opening the door for CEC and Meatloaf to commence civil lawsuits against Sony Music.

18.     As a result of the waiver of contractual time limits and statutes of limitations, Mr. Popovich and CEC were able to commence and successfully prosecute a first civil lawsuit to recover <u>unpaid</u> royalties in the matter styled as *Cleveland Entertainment Company, Inc. v. Sony Music and Entertainment Co., Inc. et al., Cuyahoga County Court of*

*Common Pleas Case No. 95-CV-295530.* ***(Referenced herein as the "First Sony Royalty Case").***

19.     As a result of Sony's continued failure and refusal to pay royalties and amounts owed to Popovich and CEC, in or about May, 2006 a second action was commenced to recover additional <u>unpaid</u> royalties due and owing for the time period following that covered by the resolution of the First Sony Royalty Case.  The second action was styled as *Stephen C. Popovich v. Sony Corporation of America, et al., United States District Court Case No. 1:06CV1096* (assigned to Judge Donald Nugent).  ***(Referenced herein as the "Second Sony Royalty Case").***

20.     Due to a pending conflict between Mr. Popovich and his former business partners, Samuel Lederman and Stanford Snyder, on or about August 19, 2009 the parties dismissed the Second Sony Royalty Case without prejudice pursuant to a negotiated Tolling Agreement and by way of a Stipulated Notice of Dismissal.

21.     Sometime in mid-2010, Mr. Popovich retained Attorney Anthony O. Calabrese, III as legal counsel.  Attorney Calabrese recommended that Mr. Popovich retain the law firm of Defendants to re-file and prosecute the Second Sony Royalty Case.

22.     On or about October 18, 2011, the Popovich Estate entered into a certain contingency fee agreement with the law firm of Cooper & Elliott and Attorneys Rex Cooper and Charles Cooper, Jr. pursuant to which the Defendants were retained to re-file and prosecute the Second Sony Royalty Case.  ***A true and accurate copy of the contingency fee agreement is attached hereto as "Exhibit 1" and is referenced herein as the "Contingency Fee Agreement."***

23.     Although the Defendants regularly represent probate estates, the Defendants never sought nor obtained the Tennessee Probate Court's approval of the Contingency Fee Agreement. Nonetheless, on or about September 28, 2011, the Defendants re-filed on behalf of the Popovich Estate the claims asserted against Sony in the Second Sony Royalty Case in the matter styled as *The Estate of Stephen C. Popovich v. Sony Music Entertainment, et al., United Stated District Court, N.D. Ohio Case No. 1:11CV2052* (**hereinafter referenced as the "Third Sony Royalty Case"**). The Third Sony Royalty Case was reassigned to Judge Donald C. Nugent.

24.     The claims asserted against Sony in the Third Royalty Case sought to recover from Sony <u>unpaid</u> royalties due and owing on the CEC catalogue, including the Meatloaf recordings, and for certain injunctive and equitable relief; *to wit,* the Defendants asserted the theory that Sony's ongoing breaches of contract and its fiduciary duties were so material as to result in a complete failure of consideration in support of the Distribution Agreements and, therefore, all Master Recordings in the CEC catalogue "reverted in their entirety to [the Estate], *ab initio.*" *Amended Complaint at "Fifth Cause of Action."* The legal theories under which the claims were asserted by the Defendants on behalf of the Estate included Breach of Fiduciary Duty *(Count One of the First Amended Complaint),* Breach of Contract *(Count Two),* Unjust Enrichment *(Count Three),* Constructive Trust *(Count Four),* and Injunctive Relief *(Count Five).*

25.     Sometime in the fall of 2012, the Third Sony Royalty Case was settled in a mediation proceeding. Although the claims asserted against Sony sought to recover money damages for the Estate in the form of the <u>past due</u> and <u>unpaid</u> royalties and to recover for the Estate the exclusive contract rights in the CEC catalogue of Master Recordings, the case

was resolved by CEC actually giving up certain valuable rights unrelated to the claims

asserted in the litigation, *to wit,* the settlement included two separate components: (1.)

Sony's payment of the unpaid royalties- the damages related to the claims asserted in the

litigation, and (2.) the sale of certain Estate assets, namely, (a.) all future CEC contract

rights, including future royalty rights and future logo rights and (b.) a surrender of certain

unreleased Michael Jackson Master Recordings.

26.     Although the contingency fee should have only applied against the unpaid

royalties, Defendants took a 1/3 contingency fee which was based on both components of

the consideration, thus, resulting in a substantial overpayment to Defendants.

27.     Moreover, Defendants failed to obtain the Tennessee Probate Court's

approval of the settlement agreement and/or the sale of the Estate assets.

28.     Furthermore, subsequent to entering into the settlement agreement, all

settlement proceeds were tendered by Sony directly to Defendants.  Defendants distributed

the settlement proceeds, including distributing to itself the improper and inflated

contingency fee, without the Tennessee Probate Court's approval.

29.     In addition to Defendants representing the Estate in the Third Sony Royalty

Case, Defendants further advised the Estate on probate matters and represented the Estate

in a litigation matter involving Attorney Sandor Frankel in the State of New York.

30.     Sometime in or about March 2013, Defendants sought from the Tennessee

Probate Court approval of attorney fees incurred in connection with the New York

litigation and counsel on other Estate matters.  At that time, certain purported creditors of

the Probate Estate learned of the fact of settlement and began questioning the settlement

terms; *to wit,* the settlement agreement was/is confidential.  Thus, the Tennessee Probate

Court ordered the settlement agreement to be submitted to the Court at which time the

Court and creditors learned of the terms of the settlement agreement, the fact that Estate

assets were sold as part of the settlement, that Defendants paid themselves a contingency

fee based on the Estate assets sold, and that Defendants had taken such actions and

distributed Estate assets without the requisite Probate Court approval or authorization.

31.     Consequently, the Probate Court held in abeyance Defendants' application for

attorney fees in connection with the New York litigation and the counsel on other Estate

matters and instructed local Tennessee Counsel to obtain Defendants' agreement to be

bound by any order of the Tennessee Probate Court relative to a determination of

Defendants' entitlement to the contingency fee.

32.     Defendants either failed or refused to consent to be bound by an order of the

Tennessee Probate Court.  Consequently, the Probate Court instructed the Estate's Personal

Representative (Mr. Stephen F. Popovich) to make demand on Cooper & Elliott to pay into

the Probate Court the full amount of the contingency fee ($766,666.67) until such time as

the Court could determine Cooper & Elliott's entitlement to the fee.

33.     Pursuant to the Court's order the Personal Representative repeatedly made

demand on Defendants for payment of the disputed contingency fee.  However, Defendants

failed and/or refused to pay the contingency fee into the Probate Court.  Consequently, the

Personal Representative was required to pay into the Probate Court the sum of

$766,666.67.

34.     Following Defendants' continued refusal to cooperate with the Tennessee

Probate Court, on or about May 27, 2014 the Probate Court authorized the Estate to retain

legal counsel (Kahn Kruse Co., LPA) to investigate the claims against Defendants and to commence a civil lawsuit to recover damages sustained by the Probate Estate.

## COUNT ONE
### (Legal Malpractice)

35.     The Plaintiff restates and reaffirms the prior allegations set forth in the Complaint as though fully rewritten herein.

36.     At all times relevant herein, Attorneys Cooper and Elliott acted on behalf of and as attorneys for the Estate.  As of the date of filing this action, Attorneys Cooper and Elliot and the law firm of Cooper & Elliott continue to represent the Estate.

37.     At all times relevant herein, Attorneys Cooper and Elliott, acting on behalf of and as employees of the law firm of Cooper & Elliott, provided legal advice to the Estate and also served as legal counsel to the Estate in the Third Sony Royalty Case and thereby formulated legal strategy, drafted pleadings, motions, briefs, and other documents before this Court, and otherwise acted in each other's capacity as legal counsel for the Popovich Estate.

38.     As legal counsel for the Popovich Estate, and in performing all services as described above, the Defendants, individually and collectively, had a duty to exercise reasonable and ordinary care, skill and diligence in the performance of all legal services, including the provision of legal advice and complying with the instructions of the Tennessee Probate Court.

39.     Attorneys Cooper & Elliott breached their duties of care to the Popovich Estate, including their duty to provide competent and knowledgeable legal counsel, and the performance of legal services by each Cooper and Elliott fell below the accepted standard of

care for attorneys of their respective experience and expertise, including, but not limited to,

the following:

a)     charging an excessive and unreasonable fee;

b)     failure to draft and enter into the Contingency Fee Agreement in accordance
       with the mandates of Rule 1.5 of the Ohio Rules of Professional Conduct;

b)     failure to advise the Estate and its Personal Representative as to legal
       necessity to obtain Probate Court approval of the Contingency Fee
       Agreement, the Sony settlement agreement, and for distribution of the
       settlement proceeds;

c)     failure to obtain the Probate Court approval of the Contingency Fee
       Agreement, the Sony settlement agreement, and for distribution of the
       settlement proceeds;

d)     failure to fully advise the Estate and its Personal Representative as to matters
       relating to the settlement agreement with Sony and the Contingency Fee
       Agreement, including the fact that Cooper & Elliott would seek a fee based on
       consideration unrelated to the claims litigated in the Third Sony Royalty
       Case; and

e)     failure to abide by and adhere to the requirements, instructions and/or
       orders of the Tennessee Probate Court.

40.     As a direct and proximate result of Defendants' conduct as described above,

the Popovich Estate has sustained damages in an amount in excess of $75,000.00, the exact

amount to be determined at trial, for which the Defendants are liable.

41.     As a further direct and proximate result of the Defendants' conduct as

described above, the Estate has incurred unnecessary and excessive legal fees and

expenses, to its detriment.


## COUNT TWO
### (Vicarious Liability/Respondeat Superior)

42.     The Plaintiff restates and reaffirms the prior allegations set forth in the

Complaint as though fully rewritten herein.

43.     At all times relevant herein, Co-Defendant Cooper & Elliott LLC was the employer of Defendants Charles Cooper, Jr. and Rex Elliott and had a right to control the method and manner of each attorney's performance of legal services.

44.     Defendant Cooper & Elliott is vicariously liable for the negligence of attorneys Cooper and Elliott under R.C. 1775.12 and/or 1776.35, and/ or under the doctrine of *Respondeat Superior*.

## COUNT THREE
### (Breach of Contract)

45.     The Plaintiff restates and reaffirms the prior allegations set forth in the Complaint as though fully rewritten herein.

46.     On or about October 18, 2011, the Popovich Estate entered into the Contingency Fee Agreement with Defendants Cooper, Elliott and Cooper & Elliott, LLC.

47.     Pursuant to the terms of the Contingency Fee Agreement, the Defendants were entitled to receive attorney fees in the amount of one-third (1/3) the recovery obtained from the disputed claims, to wit, 1/3 of the unpaid royalties.

48.     The Contingency Fee Agreement did not authorize the Defendants to receive a one-third contingency fee based on the value of Estate assets sold and which were not the subject of any disputed claim.

49.     The Defendants breached the terms of the Contingency Fee Agreement by taking one-third of the unpaid royalty claims along with one-third of the proceeds from the sale of the Estate assets sold to Sony.

50.     As a direct and proximate result of the conduct of the Defendants as described herein, the Popovich Estate sustained damages in an amount in excess of

$75,000.00, the exact amount to be proven at trial and for which the Defendants are liable.

## COUNT FOUR
### (Unjust Enrichment)

51.     The Plaintiff restates and reaffirms the prior allegations set forth in the Complaint as though fully rewritten herein.

52.     A benefit has been conferred upon the Defendants in the form of attorney fees in excess of those to which the Defendants were entitled to be paid.

53.     The Defendants know of this benefit and have retained the excessive attorney fees under circumstance which are unjust, unreasonable and in violation of Ohio law and Tennessee law.

54.     As a direct and proximate result of the Defendants' unjust enrichment, the Plaintiff has sustained damages in an amount in excess of $75,000.00, the exact amount to be determined at trial and for which the Defendants are liable.

## COUNT FIVE
### (Conversion)

55.     The Plaintiff restates and reaffirms the prior allegations set forth in the Complaint as though fully rewritten herein.

56.     Without the authority or permission of the Tennessee Probate Court, the Defendants have wrongfully exercised dominion and control over the assets of the Estate, including a portion of the proceeds from the settlement of the Third Sony Royalty Case.

57.     The exercise of this dominion and control by the Defendants was done knowingly and with the purpose and intent of depriving the Plaintiff of the funds at issue.

58.     Despite the repeated demands for a return and surrender of the funds, the Defendants have failed and refused to comply.

59.    As a direct and proximate result of the conversion as described herein, the

Plaintiff has sustained damages in an amount in excess of $75,000.00, the exact amount to

be proven at trial.

60.    In addition, the conduct of the Defendants as described herein was willful,

wanton, and/or malicious, thus, allowing for the Plaintiff to recover Punitive Damages and

Attorney Fees in an amount to be determined at trial.

Wherefore, the Plaintiff respectfully demands that judgment be entered in its favor

and against the Defendants, jointly and severally, in an amount in excess of $75,000.00, the

exact amount to be proven at trial, along with Punitive Damages and attorney fees, and any

and all additional relief this Court deems just and appropriate.

Respectfully submitted:


/s/ Scott J. Orille
SCOTT J. ORILLE (0069192)
MARK F. KRUSE (0029989)
**Attorneys for Plaintiff**
The Galleria & Towers at Erieview
1301 East Ninth Street, #2200
Cleveland, OH 44114
Telephone:  (216) 579-4114
Facsimile:  (216) 579-0605
Email: info@mkkglaw.com

JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues properly tried to a jury, with
the maximum number of jurors allowed at law.

/s/ Scott J. Orille
SCOTT J. ORILLE (0069192)
**Attorney for Plaintiff**